**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CAMPBELL HATCH and PERRY HATCH,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 20 C 7168** |
| | ) | |
| **WOLTERS KLWER UNITED STATES, INC.** | ) | |
| **HEALTH PLAN and the WOLTERS** | ) | |
| **KLUWER BENEFITS ADMINISTRATIVE** | ) | |
| **COMMITTEE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Perry Hatch is an employee of Wolters Kluwer.  Along with her daughter Campbell Hatch, Perry has sued the Wolters Kluwer United States, Inc. Health Plan and the plan's named administrator, the Wolters Kluwer Benefits Administrative Committee (collectively "Wolters").  The plaintiffs allege that Wolters improperly refused to cover residential treatment for Campbell's mental health issues after the plan's claims administrator erroneously concluded that residential treatment was no longer medically necessary.  Both sides have moved for summary judgment.

## Background

The following facts are drawn from the claim file and are undisputed except where otherwise noted.

**A.    Coverage of residential treatment under the employee benefit plan**

Campbell is a beneficiary of her mother's employer-provided health insurance,

the Wolters Kluwer United States, Inc. Health Plan (the Plan). The Plan is governed by the Employee Retirement Income Security Act (ERISA) and is administered by the Wolters Kluwer Benefits Administrative Committee (the Committee). As the plan administrator, the Committee "has full power to control and manage all aspects of the Plan and the Plan coverage options according to its terms and all applicable laws." Second Am. Compl., Ex. 1, Summary Plan Description (SPD), at 153 (dkt. no. 40-1). The Committee "may allocate or delegate its responsibilities for administering the Plan to others and employ others to carry out or give advice with respect to its responsibilities under the Plan." *Id.*

Health Care Service Corporation, which does business as Blue Cross and Blue Shield of Illinois, is the Plan's claims administrator. "Benefits under th[e] Plan will be paid if [Blue Cross] decides, in its sole discretion, that the applicant is entitled to them." *Id.* at 155. "However, in certain cases, the [Committee] makes the final determination in the event of a claims appeal." *Id.* The Plan states that appeals "must be finally decided by the claims fiduciary" before an applicant "can bring any action at law or in equity to recover Plan benefits." *Id.* at 128. The Committee "is the claims fiduciary for all eligibility claims," but it "has delegated its authority to finally determine claims to the health plans for benefit claims." *Id.*[1]

The Plan states that it "doesn't cover all types of medical expenses, even if prescribed, ordered, recommended, approved, or viewed as medically necessary by

---

[1] The Plan distinguishes between "eligibility claims" and "benefits claims," stating that "[a]n eligibility claim is a claim to participate in a plan or plan option or to change an election to participate during the year. A benefit claim is a claim for a particular benefit under a plan." *Id.* at 123. It is undisputed that this case arose out of Wolters's denial of Campbell's benefits claims.

[the applicant]'s physician." *Id.* at 83. Rather, it covers only expenses for healthcare services that the claims administrator—Blue Cross—determines to be "medically necessary." *Id.* The Plan defines "medically necessary" as follows:

> Medically necessary means that a specific medical, health care or hospital service is required, in the reasonable medical judgment of the claims administrator, for the treatment or management of a medical symptom or condition and that the service or care provided is the most efficient and economical service which can safely be provided.

*Id.* at 84. Furthermore, the Plan states that it does not cover expenses for "[s]ervices or supplies that are not specifically mentioned in [the Summary Plan Description]," *id.* at 86, but that "inpatient hospital services for the treatment of mental illness and substance abuse" may be covered if Blue Cross's "Mental Health Unit" preauthorizes the treatment and deems it medically necessary. *Id.* at 96–97. The Plan does not specifically mention outdoor behavioral health services treatment centers or "wilderness programs." PSY301.000, a Blue Cross policy guideline that is not included in the Plan, states that services at wilderness programs "may be a contract exclusion under mental health contracts or considered not medically necessary." Defs.' LR 56.1 Stat., Ex. 22, HCSC_HATCH_0001409 ("PSY 301.000") (dkt. no. 61–22).

The Plan also requires beneficiaries to exhaust administrative remedies before bringing a lawsuit. A beneficiary "must request [her] benefits or file a claim by December 31 of the year after the year in which [she] received the service or the onset of illness or injury, whichever is later." SPD at 121. If Blue Cross needs additional information to determine whether a treatment is medically necessary, a beneficiary has forty-five days to provide the requested information. If the beneficiary fails to provide the requested information, Blue Cross may decide the claim "based on information

originally provided." *Id.* at 126.

If Blue Cross denies the claim, the beneficiary must file a written appeal within 180 days of receiving a claim denial. The appeal "should include [a] copy of [the] claim denial notice," "[t]he reason(s) for the appeal," and the "[r]elevant documentation." *Id.* at 129. There is an "expedited appeals" process if Blue Cross denies a claim while the beneficiary is receiving the services, and that process requires Blue Cross to determine within twenty-four hours whether the claimed treatment is medically necessary. A beneficiary may bring a lawsuit after exhausting the appeals process but must do so within ninety days of receiving a final decision on her appeal.

**B. Campbell's medical history**

Campbell was diagnosed with attention deficit/hyperactivity disorder, anxiety, depression, and various learning disorders as a child and teenager. From September 2018 to August 2020, Campbell was admitted to various residential and outpatient mental health treatment programs. The Plan approved some but not all of those treatments.

**1. Paradigm—October 2018**

In late September 2018, Campbell was admitted for treatment at Paradigm Treatment Centers in Malibu, California. Dr. Chelsea Neumann, a psychiatrist at Paradigm, performed a psychiatric evaluation of Campbell and concluded as follows:

> Campbell is a 16 year old adopted Caucasian female with history of scoliosis surgery and rod placement [in] January 2018, chronic pain and somatic symptoms related to the surgery, recent sexual assault and breakup from her boyfriend one month ago, and symptoms of bulimia nervosa, who presents for admission to [a residential treatment center] due to symptoms of a major depressive disorder, self-injury and suicidal ideation the past month, and symptoms of anxiety and PTSD that have been treatment resistant to outpatient therapy and medication

4

> management. Campbell is at elevated risk for harm to herself, due to history of impulsive self-injury and past [suicidal ideation], symptoms of treatment-resistant depression, anxiety, and ADHD in addition to chronic pain and recent impulsive and oppositional behaviors, and limited insight into her condition, though protective factors include access to mental health care, motivation for care and engagement in treatment, and supportive parents. She can be appropriately managed at an [residential treatment center] level of care.

Administrative R. ("AR"), HCSC_HATCH_0001673–74 (dkt. no. 55). On October 4, Blue Cross reviewer Anish Varughese approved ten days of treatment because he determined that Campbell had satisfied one or more of the following three criteria:

> 1. Being at risk of serious harm to self/others as evidenced by _____.
> 2. Severe symptoms such as psychosis, mania, extreme agitation, cognition, memory, judgment, or impulse control as evidenced by _____.
> 3. Severe behavioral health disorder-related symptoms or condition as indicated by major dysfunction in daily living and/or life threatening self-neglect as evidenced by _____.

*Id.*, HCSC_HATCH_0008613. Varughese did not indicate which of the three criteria he believed Campbell had satisfied and did not complete the blanks listed above, but he stated in another section of his notes that Campbell had expressed "passive/fleeting [suicidal ideation], no plan or intent, denies [homicidal ideation], no psychosis, no aggression" and that she had last harmed herself on September 17. *Id.*, HCSC_HATCH_0008611. He also noted that she had low appetite, poor and disheveled "activities of daily living," poor sleep because she was only sleeping six to seven hours, and no medical issues. *Id.*

On October 9, Varughese approved seven more days of treatment after concluding that Campbell still satisfied one or more of the three above criteria, but again he did not specify which criteria. He noted that barriers to discharging Campbell included her continued "passive [suicidal ideation] with no plan or intent" but that

Campbell "denie[d] any [homicidal ideation]" and had "no psychosis, no aggression, no episodes of self-harm but having urges at times." *Id.*, HCSC_HATCH_0008608. Varughese also stated that Campbell's "activities of daily living" were fair and her appetite was normal but that she was having difficulties sleeping.

On October 17, Varughese authorized five more days of treatment because of "DC planning, medication assessment, family sessions, and [Passover] weekend." *Id.*, HCSC_HATCH_0008606. He concluded, however, that Campbell no longer satisfied the criteria for residential treatment because:

> 1. Risk status is manageable at a lower level of care as evidenced by . . . PT DENIES [SUICIDAL IDEATION], [HOMICIDAL IDEATION] OR PSYCHOSIS, NO AGGRESSION WITHIN 48-72 HRS, PUNCHED WALLS 2 DAYS AGO DID NOT REQUIRE MEDICAL ATTENTION
> 2. Medical needs manageable at a lower level of care as evidenced by . . . CONTINUES TO COMPLAIN ABOUT SOMATIC CONCERNS— HEADACHES, BACK ACHES, BUT LESS FREQUENT.
> 3. No evidence of functional status impairments that could not be addressed at a lower level of care as evidenced by . . . [ACTIVITIES OF DAILY LIVING]—FAIR, SLEEP—IMPROVING, STILL STRUGGLES, APPETITE—NORMAL, VITALS—[WITHIN NORMAL LIMITS], COMPLIANT WITH MEDS,

*Id.* The day after this assessment, Campbell expressed suicidal ideation but later stabilized and "no longer ha[d] [suicidal ideation] by the end of the day." *Id.*, HCSC_HATCH_0008601. Blue Cross reviewer Kelly Walker concluded on October 22 that Campbell met the criteria for continued residential treatment, noting Campbell's "recent [suicidal ideation], skin picking behavior, poor coping skills/unable to implement, parents don't feel they can keep [patient] safe at home. Functional status not acceptable for a lower level of care as evidenced by sleep poor." *Id.*, HCSC_HATCH_0008602.

A few days later, on October 26, Varughese authorized four more days of

treatment despite concluding that Campbell did not meet the criteria for continued residential health treatment.  His notes explaining that conclusion did not address Walker's October 22 findings but were identical to his October 17 notes.  Varughese then denied continued treatment on October 31, concluding that Campbell did not satisfy the criteria for residential treatment.  He was not able to speak with Dr. Neumann before making this determination, and his reasons for the denial were almost identical to his notes from August 17.

On November 2, Dr. Phillip Helding, another Blue Cross reviewer, spoke with Dr. Neumann and agreed with Varughese's denial, stating that residential treatment was not medically necessary for the following reasons:

> You are not having plan or intent to hurt yourself or anyone else. You are not hearing voices or seeing things that are not there. You are not hearing voices telling you to harm yourself or others. You are not aggressive or violent. There are no medical problems reported. No severe side effects from medications. You could be treated at a lower level of care.

*Id.*, HCSC_HATCH_0008593.  Dr. Helding noted that "[a]s of 10/30/2018 she is improving, but that "[t]here are a lot of problems with her being honest . . . .  Working with her on the therapy side of things.  Significant emotional dysregulation with urges to harm herself and suicidal thoughts when she is overwhelmed.  Talks about being adopted and how overwhelming that is."  *Id.*

On November 6, Blue Cross issued a notice denying Campbell's request for eight days of treatment beginning October 30.  The notice stated that "[p]er the medical necessity provision of your benefit plan, a medical necessity review has been completed."  *Id.*, HCSC_HATCH_0004956.  It also referenced the reasons in Dr. Helding's notes and informed Campbell of her right to appeal.

That same day, Paradigm submitted an expedited appeal, which Blue Cross reviewer Dr. Arthur Chavason denied. Dr. Chavason noted that he spoke with Dr. Neumann, who "want[ed] more time" and "[was] requesting [eight days of treatment starting October 30] of Child/Adolescent [residential treatment center] level of care be covered." *Id.*, HCSC_HATCH_0008590. He also described his conversation with Dr. Neumann as follows:

> Dr. [Neumann] states that [patient] has been also suffering with conversion disorder, struggled with medical difficulty of spinal surgery of scoliosis in January and recent trauma/assault with 2 boys. Dr. Newmann confirms that [patient] is doing better, no [suicidal/homicidal ideation], still struggling with self worth/self esteem, but is working with adopted mom and family better as well. She is eating all of her meals and attending to [activities of daily living].

*Id.* Dr. Chavason concluded that Campbell did not meet the criteria for residential care, and both his notes and the notice Blue Cross sent to the plaintiffs denying the appeal stated:

> You are not a danger to yourself. You are not a danger to others. You do not have psychiatric conditions that need this level of care. You do not have medical conditions that need this level of care. You do not have substance use issues that need this level of care. You are taking medications. You are completing your actives of daily living. You are motivated. You are participating in your treatment. You can safely be treated in a lower level of care. You have supportive family. You have a safe discharge plan.

*Id.*; *Id.*, HCSC_HATCH_4930. Campbell ended her inpatient treatment at Paradigm on November 6.

After leaving Paradigm, Campbell received treatment at Hillside, an intensive outpatient facility, from November 26 to November 30. She also received treatment at Ridgeview, another outpatient facility, from December 4 to December 6. Ridgeview

admitted Campbell for inpatient treatment from December 6 to December 14, and she

was in outpatient treatment at Ridgeview for another five days before being

administratively discharged on December 19.  The Plan covered Campbell's treatment

at Hillside and Ridgeview.

### 2.    Paradigm—January 2019

On December 20, 2018, Campbell was admitted for inpatient treatment at

Paradigm.  Blue Cross reviewer Nikita Bhakta approved eight days of treatment on

December 24, stating that Campbell met the criteria for residential treatment because

of:

> 1. Being at risk of serious harm to self/others as evidenced by reporting
> passive [suicidal ideation].
> 2. Severe symptoms such as psychosis, mania, extreme agitation,
> cognition, memory, judgment, or impulse control as evidenced by
> reporting self harm urges and engaged self harm behavior.
> 3. Severe behavioral health disorder-related symptoms or condition as
> indicated by major dysfunction in daily living and/or life threatening self-
> neglect as evidenced by unstable mood, poor impulse control, poor
> implementation of learned coping skills, poor insight and judgment, and
> reporting passive [suicidal ideation].

*Id.*, HCSC_HATCH_0008644.  On December 28, Varughese determined that Campbell

satisfied the criteria for continued residential treatment and authorized seven more

days.  As he had done on October 4 and October 9, Varughese did not specify which of

the criteria Campbell had satisfied, but he noted that barriers to discharge were as

follows:

> [Patient] denies [suicidal ideation], [homicidal ideation] or psychosis, no
> aggression, urges/acts of self-harm—punching walls, scratching hand,
> anger outburst, urges to self-harm, [activities of daily living]—unkempt,
> disconnected from physical situations, recently defecated in pants and
> was not concerned about it or attended to it.  Sleep—fair, appetite—
> normal, functional impairments—impulsive, anxious, depressed, mood
> swings, angry, poor insight/judgement, poor boundaries, [patient]

> continues to exhibit[] storytelling, possible trauma that is not reported.  No
> medical issues, vitals—[within normal limits].

*Id.*, HCSC_HATCH_0008640.  On January 3, 2019, Varughese again concluded that

Campbell met the criteria for residential treatment without specifying which criteria she

had satisfied.  He stated that barriers to discharge included "eating issues," a difficult

session with her parents during which Campbell expressed suicidal thoughts, Campbell

"endorsing [suicidal ideation] when upset—last expressed 12/29" but no homicidal

ideation, aggression or psychosis.  *Id.*, HCSC_HATCH_8637.  Varughese also noted

that Campbell's "activities of daily living," sleep, and appetite were normal but that she

had scratched herself on December 29.  *Id.*

Six days later, on January 9, Varughese concluded that Campbell did not meet

the criteria for further inpatient treatment because she (1) had no suicidal or homicidal

ideation, psychosis, or aggression, (2) she had some urges to self-harm but had no

incidents within the last 24–48 hours, (3) did not have any medication issues, and (4)

her sleep, appetite, and "activities of daily living" were within a normal range.  *Id.*,

HCSC_HATCH_0008635.  Varughese rejected continued treatment despite noting that

Campbell "report[ed] smoking pot regularly since time she was not hospitalized,"

"reported that she had been snorting her Adderal[l], and done molly and LSD a couple

of times[,]" and "continu[ed] to be [at] risk of self-harm if [discharged]."  *Id.*,

HCSC_HATCH_0008633, 8635.

On January 10, Blue Cross reviewer Dr. Anas Alkhatib reviewed the case and

spoke with Dr. Neumann.  Dr. Alkhatib noted that Dr. Neumann "report[ed] that

[Campbell] needs [residential treatment center level of care] . . . . [Campbell] has urges

to use substances.  [Campbell] is self-harming (no dates or details provided)."  *Id.*,

HCSC_HATCH_0008632.  Nevertheless, Dr. Alkhatib also denied the request for

coverage, stating:

> You are not having plan or intent to hurt yourself or anyone else. You are
> not hearing voices or seeing things that are not there. You are not hearing
> voices telling you to harm yourself or others. You are not aggressive or
> violent. There are no medical problems reported. No severe side effects
> from medications. You could be treated at a lower level of care.

*Id.*  That same day, Blue Cross issued a notice denying Campbell's request for nine

days of treatment beginning January 10.  The notice stated that "[p]er the medical

necessity provision of your benefit plan, a medical necessity review has been

completed."  *Id.*, HCSC_HATCH_0004842.  It also mentioned the reasons in Dr.

Alkhatib's notes and informed Campbell of her right to appeal.

Paradigm submitted an expedited appeal on January 15, which Dr. Mohammad

Ahmad denied.  Dr. Ahmad was not able to reach Campbell's attending psychiatrist Dr.

Neumann, so his review "was based on the written clinical information[.]"  *Id.*,

HCSC_HATCH_0008629.  Dr. Ahmad stated that there was "[n]o evidence of

immediate safety risk established, either due to life-threatening withdrawal problems or

medical or psychiatric comorbidity requiring 24 hour care.  No [homicidal

ideation]/[suicidal ideation]/[auditory verbal hallucinations]."  *Id.*  He also concluded that

Campbell did not meet the criteria for residential care because:

> You are not having self harming thoughts for yourself or others. You are
> thinking more clearly. You are cooperative with treatment. You are able to
> attend to your daily self-care needs. You can be treated outside of a
> hospital.

*Id.*  Blue Cross issued Campbell a notice denying her appeal on January 15, and the

reasons in that notice were almost identical to the statement just quoted.

11

Campbell remained in residential treatment at Paradigm until January 18, 2019, but as a result of the denial of Paradigm's appeal, the Plan only covered her treatment until January 9.

### 3. New Vision

From February 15 to April 29, 2019, Campbell received residential mental health treatment at New Vision Wilderness, an outdoor behavioral health services treatment center. Campbell's counselor at New Vision stated that she "was referred to New Vision Wilderness after continued struggles with in and out of home treatment interventions . . . . Campbell's parents decided to enroll her in New Vision Wilderness at the recommendation of their educational consultant." *Id.*, HCSC_HATCH_0003370.

There is no evidence indicating that Campbell's mother Perry requested preauthorization for Campbell's treatment at New Vision, but she submitted a request for coverage sometime prior to January 2, 2020. Blue Cross denied the request, citing "Lack of Medical Necessity" as the reason for its decision and stating that "[s]ervices provided at behavioral medication facilities, boot camps, emotional group academies, military schools, therapeutic boarding schools, wilderness programs, halfway houses and group homes may be a contract exclusion under mental health contracts or considered not medically necessary." *Id.*, HCSC_HATCH_0001176. Blue Cross's denial letter also stated "Medical Policy Manual Article Number: PSY301.000." *Id.*

Perry appealed that decision, and Blue Cross denied the appeal in July 2020. In explaining its decision, Blue Cross stated that "[a]fter review of the appeal request, claim, and the member's benefit book, it has been determined no benefits are available. This service is an exclusion of the member's contract." *Id.*, HCSC_HATCH_0004672.

The letter quoted part of the "Mental Health Unit" of the SPD, but it did not state any other reasons for denying coverage for Campbell's treatment at New Vision.  The letter also informed Campbell that she had exhausted her internal appeal rights.

### 4. CALO

Campbell received residential mental health treatment at Change Academy at Lake of the Ozarks (CALO) from April 30, 2019 to August 17, 2020.  On May 1, 2019, CALO therapist Malinda Williams stated in a "Suicide Risk Assessment" that Campbell had exhibited "Self-injurious Behavior Without Suicide Intent," "Hopelessness," and "Depressive Episode." *Id.*, HCSC_HATCH_0003419.  Williams also recognized that there were various "protective factors" such as "identifies reason for living" and "support social network or family, and she noted "currently none reported" under a section for "suicidal, self-injurious, or aggressive behaviors." *Id.*  An evaluation by Dr. Jyotsna Nair that same day noted that Campbell had not cut herself since December 2018.

Medical records from CALO indicated that Campbell "Required Emergency Safety Physical Intervention" on May 4, 2019 and was placed on a heightened level of supervision by CALO personnel from May 12 to May 16 for risk of self-harm. *Id.*, HCSC_HATCH_0003482.  Williams noted in a May 14 assessment that Campbell had "self-harmed on arm and hip with a sharp rock" and "stated she is suicidal to several peers, staff, and therapist." *Id.*, HCSC_HATCH_0003421.  Williams also noted the protective factors and that Campbell "stated she does not have a plan and does not wish to die but thinks about dying often." *Id.*  On May 28, Campbell harmed herself. The next day, she threatened CALO staff, punched walls/objects and knocked over furniture, and harmed herself again.  On May 31, Campbell refused to eat.  CALO

personnel placed her on a heightened level of supervision from May 28 to May 31, 2019 for risk of harm to herself and others.

Campbell's treatment at CALO lasted until August 17, 2020. Medical records from CALO describe various incidents between May 31, 2019 and August 17, 2020. In June 2019, Campbell expressed wanting to harm or kill herself on several occasions, and on one occasion she said, "Just don't let me back into the community I will kill [a peer]." *Id.*, HCSC_HATCH_000748–49, 000411, 000414. Campbell engaged in self-harm several times and slapped a peer on one occasion in July and August 2019. She also expressed that she had heard voices, had urges to harm herself on multiple occasions, and engaged in self-harm at least once in October 2019. Campbell harmed herself on at least two occasions in November 2019, hitting her head and back against a wall on one occasion and punching walls on another. In January 2020, she engaged in self-harm, punched and hit her back against walls, and physically assaulted a teammate. Campbell also harmed herself at least twice—once requiring her hand to be placed in a cast—in February and March 2019, and she was placed on a heightened level of supervision due to a risk of harming herself or others on at least eleven occasions during those two months.

On February 6, 2020, Blue Cross reviewer Joshua Hovland denied a request to cover Campbell's treatment at CALO from April 30 to May 31, 2019, stating "[a]t admit [Campbell was] congruent, no [homicidal ideation]/[suicidal ideation], no hallucinations, no delusions, mood stated as tired, cooperative. No displays of physical aggression, no issues w/ hygiene, no issues with sleep." *Id.*, HCSC_HATCH_0008660. Another Blue

Cross reviewer, Dr. Fatema Willis, reviewed the clinical notes the next day and agreed with Hovland's denial of coverage, stating:

> At the time of admission and on the dates in question you did not need 24-hour nursing, medical, or psychiatric care. You could have effectively been treated in a less restrictive setting. You did not have suicidal intent. You did not have homicidal ideations. You were completing your daily living needs. You were attending groups. You were going on off-campus passes. You had safe social support. You did not have issues that would prevent you from getting treatment in a lower level of care. You had access to a lower level of care in your home area.

*Id.*, HCSC_HATCH_0008658. She also noted that "at the time of admission [Campbell] denied [suicidal ideation]/[homicidal ideation] and was not manic or psychotic . . . . During the dates in question the [patient] displayed intermittent episodes of maladaptive behaviors that were redirectable." *Id.*

On February 7, the same day as Dr. Willis's decision, Blue Cross issued a denial notice stating that "per the medical necessity provision of your benefit plan, a medical necessity review has been completed" and the reason was "[r]equested service(s) does not meet clinical criteria, guidelines, or standards of care for diagnosis." *Id.*, HCSC_HATCH_8924. The notice repeated verbatim Dr. Willis's reasons for concluding that Campbell did not meet the criteria for residential care.

In July 2020, Perry appealed Blue Cross's February 7 denial and requested coverage of Campbell's treatment at CALO from April 30, 2019 to May 31, 2020. The appeal included a letter from Campbell's CALO therapist Malinda Williams. In that letter, Williams appeared to quote from Dr. Neumann's October 2018 evaluation of Campbell, stating that Campbell had "presented for admission to [the residential treatment center] due to symptoms of a major depressive disorder, self-injury and suicidal ideation the past month, and symptoms of anxiety and PTSD that had been

treatment resistant to outpatient therapy and medication management." *Id.*, HCSC_HATCH_000629. She also mentioned that Campbell had required physical interventions because of her "physician aggression, running from staff/the program, property destruction and self-harm." *Id.*, HCSC_HATCH_000630. In particular, Williams noted that Campbell would "begin kicking and hitting the walls," was "known to also self-harm when feeling dysregulated or feeling shameful as well[,]" and "has been physically aggressive towards peers but usually not to try to hurt them." *Id.* Williams ended her letter by concluding that "it is medically necessary for Campbell to remain in treatment at CALO" and that "[d]ue to her continued unsafe behaviors that Campbell displays in the form of physical aggression, self-harm, and running away, it is not recommended that she be in the home or community environment." *Id.*, HCSC_HATCH_000631.

Dr. Allen Lavender nevertheless denied the appeal, finding that Campbell's treatment at CALO was not medically necessary because:

> You do not have a plan or intent to harm yourself. You do not have a plan or intent to harm others. You are not hearing voices telling you to harm yourself or anyone else. You are not aggressive or violent. There are no medical issues that require treatment at this level of care. You have no severe side effects from medications. You could be treated safely and effectively at a lower level of care.

*Id.* HCSC_HATCH_0008653. He also stated that Campbell was "admitted due to emotional dysregulation and irritability" and had no suicidal ideation, homicidal ideation, psychosis, or "significant biomedical complications that required the level of care requested." *Id.*

On September 4, 2020, Blue Cross issued a notice informing the plaintiffs their appeal was denied, stating that "[p]er the medical necessity provision of your benefit

plan, a medical necessity review has been completed." *Id.*, HCSC_HATCH_0003596.
The notice listed the service dates as April 30, 2019 to May 31, 2019, repeated Dr.
Lavender's reasons for finding residential care not medically necessary, and did not
mention the letter from Campbell's treating therapist Williams.

In her appeal, Perry also requested coverage for the period from June 1, 2019 to
May 31, 2020, but neither party points to evidence in the administrative record of a
decision by Blue Cross regarding the period after May 31, 2019. A December 2019
letter from Blue Cross to Perry stated:

> The claim has [been] denied due to needing medical records in order to
> finalize the processing of the claim. The records were requested on
> 12/02/2019. We ask that you allow up to 30-45 business days for the
> provider to respond to our medical records request. You will be notified by
> explanation of benefits or letter once the claim has finalized.

*Id.*, HCSC_HATCH_0001719. The defendants have not cited any record evidence
indicating that the plaintiffs were "notified by explanation of benefits or letter once the
claim has finalized" for any requested periods after May 31, 2019.

From August 2019 to October 2020, CALO faxed various medical records to Blue
Cross on eighteen different occasions, including records for the period from April 30,
2019 to June 28, 2020 and July 19, 2020 to August 17, 2020. Notes by Blue Cross
reviewers indicated that Blue Cross received these records but found them insufficient.
On September 29, 2020, a Blue Cross reviewer noted that they had received medical
records for August 1 to August 7, 2020 but stated:

> Provider needs to submit documentation requesting medical necessity
> review for DOS from 6/1/19 to discharge, clinical documentation 6/1/19
> 7/30/19, 11/1/19 11/12/19, 12/30/19 12/31/19, 6/1/2020 7/30/2020,
> Discharge [summary], Admission note transitioning from New Visions and
> admission to CALO residential level of care.

*Id.*, HCSC_HATCH_0008652.  A similar note on October 22, 2020 stated that Blue

Cross had received records from CALO for "02/15/2019 (ADMIT) to 11/30/2019" but

had "[i]nsufficient information to complete review" because it

> Need[ed] complete medical record including level of care with the DOS for
> each level of care, discharge summary, detailed clinical notes from and
> treatment records for entire treatment episode. IF PHP/IOP needing the
> program frequency and number of sessions.

*Id.*, HCSC_HATCH_0008651.  This note appears to be at least partially inaccurate, as it

states that Blue Cross received records from CALO from *February 15*, 2019 to

November 30, 2019 even though Campbell had not been admitted to CALO until April

30 of that year.

A November 3, 2020 note stated that Blue Cross had received records from

CALO for "3/1/2020 to 3/31/2020" but still had "[i]nsufficient information to complete

review" because it

> Need[ed] complete medical record including level of care, diagnosis,
> intake assessment, discharge summary, psychological evaluation,
> detailed clinical notes, and treatment records for entire treatment episode.

*Id.*  A November 10, 2020 note mentioned that Blue Cross had received records from

CALO for "8/1/2020 to 8/17/2020" but stated that Blue Cross still did not have sufficient

information for reasons identical to those stated in the November 3 note.

Wolters points to no evidence in the administrative record suggesting that the

plaintiffs were notified that these submissions from CALO—all of which occurred after

Blue Cross's December 2019 letter—were insufficient.  Blue Cross approved payment

for Campbell's treatment at CALO in September and October 2019, which Wolters

contends was an erroneous approval.  Blue Cross did not approve any other payments

for Campbell's treatment at CALO.

### C.     The instant suit

The plaintiffs filed this lawsuit in December 3, 2020.  Judge Norgle dismissed Blue Cross as a defendant in November 2021.  The case was later reassigned to the undersigned judge.

### Discussion

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *United States v. Z Inv. Props.*, 921 F.3d 696, 699-700 (7th Cir. 2019).  Wolters argues that it is entitled to summary judgment because the plaintiffs failed to file appeals within the plan's contractual limitations period for three of the disputed treatment periods and did not exhaust administrative remedies regarding the fourth period.  Wolters also contends that it is entitled to summary judgment because no reasonable finder of fact could find that it or its claims administrator Blue Cross acted arbitrarily or capriciously.

### A.     Timeliness

Wolters contends that the plaintiffs' claims for treatment at Paradigm and New Vision are time-barred.  The Court disagrees.

To bring an ERISA claim under section 1132, the plaintiff must assert the claim within the statute of limitations.  *Rupert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 941 (7th Cir. 2013).  Because Congress did not expressly include a statute of limitations for claims under section 1132, "the court borrows a statute of limitations from an analogous state law."  *Id.*  The Seventh Circuit has identified 735 ILCS 5/13-206, which provides a ten-year statute of limitations for actions on certain written instruments, as the analogous state law in Illinois.  *Lumpkin v. Envirodyne*

19

*Indus., Inc.*, 933 F.2d 449, 465–66 (7th Cir. 1991); *see also Hakim v. Accenture United States Pension Plan*, 656 F. Supp. 2d 801, 819 (N.D. Ill. 2009) (applying the ten-year statute of limitations of 735 ILCS 5/13-206 to a section 1132 claim).  If a policy contains a provision specifying a shorter limitations period, a federal court "must give effect to the policy's limitations provision unless [the court determines] either that the period is unreasonably short, or that a 'controlling statute' prevents the limitations provision from taking effect."  *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 109 (2013) (internal citation omitted).

The parties do not dispute that the Plan requires beneficiaries to file suit within ninety days of a final decision on a claim appeal, and the plaintiffs do not argue that a ninety-day period is unreasonably short.  Rather, the plaintiffs assert that United States Department of Labor regulations required Wolters to inform them of the contractual limitations period.

Section 503 of ERISA requires every employee benefit plan to

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133(1)–(2).  Two provisions in the Department of Labor's implementing regulations, 29 C.F.R. § 2560.503-1(j)(4)(ii) and 29 C.F.R. § 2560.503-1(g)(1)(iv), address the issue of limitations periods.  The plaintiffs first point out that section (j)(4)(ii) of the regulation requires a "statement of the claimant's right to bring an action" to also "describe any applicable contractual limitations period that applies to the claimant's right

to bring such an action, including the calendar date on which the contractual limitations period expires for the claim."  29 C.F.R. § 2560.503-1(j)(4)(ii).  Wolters contends that the section is inapplicable because it begins with the phrase "[i]n the case of a plan providing disability benefits" whereas this case involves a group *health* plan, and that section (j)(5)—the section of the regulation governing group health plans—lacks any language imposing such a requirement.

Although the plaintiffs argue that the rulemaking comments to section (j)(4)(ii) support their position, the Court need not decide this issue, because section (g) of the regulation independently requires notice of contractual limitations periods in adverse benefit determinations.  Section (g)(1) states:

> (1) Except as provided in paragraph (g)(2) of this section, the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination . . . . The notification shall set forth, in a manner calculated to be understood by the claimant—
> . . . .
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;
>
> . . .

29 C.F.R. §§ 2560.503-1(g)(1), (1)(iv).  The Seventh Circuit has yet to address the issue, but as the plaintiffs point out, three other federal courts of appeals have held that the language of section (g)(1)(iv) requires a plan administrator to disclose the contractual limitations period.  *See Mirza v. Ins. Adm'r of Am., Inc.*, 800 F.3d 129, 134–137 (3d. Cir. 2015) (holding in a dispute involving a group health plan that "'[i]ncluding' modifies the word 'description,' . . . . If the description of the review procedures must "includ[e]" a statement concerning civil actions, then civil actions are logically one of the

review procedures envisioned by the Department of Labor.  And as with any other review procedure, the administrator must disclose the plan's applicable time limits."); *Moyer v. Metro. Life Ins. Co.*, 762 F.3d 503, 505 (6th Cir. 2014) ("The claimant's right to bring a civil action is expressly included as a part of those procedures for which applicable time limits must be provided."); *Ortega Candelaria v. Orthobiologics LLC*, 661 F.3d 675, 680 n.7 (1st Cir. 2011) ("We think it clear that the term 'including' indicates that an ERISA action is considered one of the 'review procedures' and thus notice of the time limit must be provided.").  Although two courts of appeals have found otherwise, the Court agrees with its colleague Judge Joan Lefkow that "the First, Third, and Sixth circuits' opinions are better reasoned because they consider the statute and regulation in the context of the ameliorative intent of the Congress in enacting ERISA."  *Hewitt v. Lincoln Fin. Corp.*, No. 18 C 8235, 2021 WL 353884, at *3 (N.D. Ill. Feb. 2, 2021).

The Court thus concludes that Wolters had an obligation to inform the plaintiffs of the ninety-day limitations periods in the denial notices it issued regarding Campbell's treatment at Paradigm and New Vision.  It is undisputed that Wolters did not do so, which means it violated 29 C.F.R. § 2560.503-1(g)(1)(iv).  "[T]he appropriate remedy for this regulatory violation is to set aside the plan's time limit and apply the limitations period from the most analogous state-law cause of action."  *Mirza*, 800 F.3d at 131. Because the statute of limitations in Illinois is ten years, *Lumpkin*, 933 F.2d at 465, Campbell's claims regarding Paradigm and New Vision are timely.

## B.    Exhaustion

Next, Wolters contends that the plaintiffs failed to exhaust remedies provided by the Plan regarding their claim for benefits at CALO.  This argument also lacks merit.

22

A defendant is entitled to judgment on a plaintiff's ERISA claim if the plaintiff has not exhausted the remedies provided by the plan administrator. *Orr v. Assurant Emp. Bens.*, 786 F.3d 596, 601 (7th Cir. 2015). The Seventh Circuit has recognized two viable excuses for failing to exhaust internal plan remedies: "'where there is a lack of meaningful access to review procedures, or where pursuing internal plan remedies would be futile.'" *Schorsch v. Reliance Standard Life Ins. Co.*, 693 F.3d 734, 739 (7th Cir. 2012) (quoting *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 361 (7th Cir. 2011)). A beneficiary is denied meaningful access if the defendant refuses to provide the documents necessary for an appeal, *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 403 (7th Cir. 1996), and "futility is demonstrated by showing that it is certain a plaintiff's claim will be denied by the plan administrator." *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 662 (7th Cir. 2005).

To exhaust administrative remedies under the Plan, a beneficiary must first file a claim for benefits and then file a written appeal if that claim is denied. The written appeal should include a copy of the claim denial notice, the reason for the appeal, and the relevant documentation. SPD at 129. The parties do not dispute that Perry filed a claim for Campbell's treatment at CALO and later appealed Blue Cross's denial of that claim. Wolters contends, however, that the plaintiffs did not appeal the denial of coverage for any months after May 31, 2019 because Perry included only the claim denial notice for the month of May 2019 with her appeal. Yet not only did Perry's appeal include the dates and billed amounts for each of the thirteen months between April 30, 2019 and May 31, 2020, but as the plaintiffs also assert, Perry was unable to provide any other claim denial notices because Blue Cross never sent her any such notices.

23

Wolters fails to cite any evidence in the nine-thousand-page administrative record indicating otherwise. Instead, it points to a December 2019 letter stating that "[t]he claim has [been] denied due to needing medical records in order to *finalize the processing* of the claim" and "[y]ou will be notified by explanation of benefits or letter once the claim *has finalized*." AR, HCSC_HATCH_0001719 (emphasis added). This letter is notably shorter than the notice denying coverage for May 2019, which included a "reason" and stated that "[t]he clinical rational for the denial of the request for benefit/service" was lack of medical necessity, and its language is clear that Campbell's claim had not yet been finalized. Furthermore, Blue Cross issued this letter *eight months* before Campbell's treatment at CALO ended, and nothing in the record suggests that it was deciding whether to preauthorize future treatment.

Aside from this letter, Wolters cites a few record request letters from Blue Cross to CALO and several Blue Cross reviewer notes from September through November 2020. None of these documents establish, however, that Blue Cross denied the plaintiffs' request for coverage for June 1, 2019 to August 17, 2020 because of insufficient documentation *and* informed the plaintiffs of that decision.

Without any notice from Blue Cross that their claim for coverage for the post-May 2019 period had been denied, the plaintiffs could not have filed an appeal and included "[a] copy of [their] claim denial notice" as the Plan's procedures required. SPD at 129. The Court therefore concludes that even if the plaintiffs failed to exhaust administrative remedies for Campbell's treatment at CALO between June 1, 2019 and August 17, 2020, there "has been a lack of meaningful access to the review procedures" that excuses their failure. *Wilczynski*, 93 F.3d 403.

**C.  Contract exclusion**

Wolters also argues that the Plan does not cover wilderness programs like New Vision, but it has not met its burden of proof on this point.

A defendant "cannot adopt *any* guidelines they choose and then rely upon these guidelines with impunity; rather, they may rely only upon those guidelines that reasonably interpret their plans."  *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1036 (7th Cir. 1990) (emphasis in original).  A beneficiary must prove her "entitlement to the benefits of the insurance coverage," but a defendant bears "the burden of establishing [the plaintiff]'s lack of entitlement because she falls within the 'exclusions' section of the insurance contract."  *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

Wolters contends that because the Plan itself does not mention wilderness programs, Blue Cross's conclusion that PSY301.000 excluded New Vision was a reasonable interpretation of the Plan's terms.  But although the denial of Perry's appeal stated that New Vision "*is* not a benefit of the contract (provision *is* not covered)," AR, HCSC_HATCH_0004672 (emphasis added), PSY301.000 states only that wilderness programs "*may* be a contract exclusion under mental health contracts or considered not medically necessary."  *Id.*, HCSC_HATCH_0001409 (emphasis added).  The statement that such programs "may" be excluded necessarily means that they are not *per se* excluded, and PSY301.000 is silent about how to determine when a wilderness program is excluded or instead is medically necessary.  This stands in stark contrast to PSY301.000's unambiguous statement that eighteen other services—from behavioral modification for lifestyle enhancement to obesity control therapy to dance therapy—are

not medically necessary. Blue Cross seemed to recognize this ambiguity when it stated in the first denial notice that "[s]ervices provided at . . . wilderness programs . . . *may* be a contract exclusion under mental health contracts or considered not medically necessary," *id.*, HCSC_HATCH_0001176 (emphasis added), and its justification for denying Campbell's New Vision claim amounted to simply referring to a guideline suggesting some contracts may exclude wilderness programs. This does not establish that the particular group health plan at issue did in fact exclude this specific wilderness program. For these reasons, Wolters has failed to satisfy its burden of proving that New Vision fell within an exclusion to the Plan.

Because Blue Cross raised no other bases for denying coverage for Campbell's treatment at New Vision, the Court grants summary judgment in favor of the plaintiffs on this claim.[2]

**D.    Merits**

The terms of the Plan give Blue Cross the discretionary authority to determine benefits, which would require the Court to review Blue Cross's decisions under the

---

[2] Wolters also contends that Campbell's treatment at New Vision was not covered because the plaintiffs did not seek preauthorization. The plaintiffs correctly point out, however, that neither the initial denial notice for the New Vision claim nor the denial of Perry's appeal cite to lack of preauthorization as a reason for the denial. Wolters's preauthorization argument therefore fails, as a defendant "is required to give [the plaintiff] every reason for its denial of benefits at the time of the denial." *Reich v. Ladish Co.*, 306 F.3d 519, 524 n.1 (7th Cir. 2002); *see also Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th Cir. 1992) ("'A post hoc attempt to furnish a rationale for a denial of . . . benefits in order to avoid reversal on appeal, and thus meaningful review' is not acceptable.") (internal citation omitted).

arbitrary and capricious standard.[3]  *See Lacko v. United of Omaha Life Ins. Co.*, 926 F.3d 432, 439 (7th Cir. 2019).  The plaintiffs argue that the Court should instead review Blue Cross's decisions de novo because neither it nor Wolters afforded the plaintiffs a full and fair review of the claims.  The Court need not decide this issue, however, because Blue Cross's decisions warrant reversal and remand even under the arbitrary and capricious standard.

"Although [the arbitrary and capricious standard] is necessarily deferential, it is not a rubber stamp," and the Court "will not uphold an administrator's decision when there is an absence of reasoning in the record to support it." *Id.* (internal quotation marks omitted).  The arbitrary and capricious standard requires the plaintiff to show that the administrator's decision was unreasonable, not merely erroneous.  *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003); *see also Marrs v. Motorola, Inc.*, 577 F.3d 783, 786 (7th Cir. 2009) ("[T]he court can . . . reject the administrator's interpretation only if it is unreasonable ('arbitrary and capricious').").

The Seventh Circuit has held that rejecting evidence based on "selective readings that are not reasonably consistent with the entire picture" is a "hallmark of an arbitrary and capricious decision." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).  Similarly, the court has found a termination of benefits to be arbitrary and capricious when the defendant "failed to consider [an individual]'s complete medical history and rejected, without explanation, important aspects of [a medical professional's evaluation]." *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 835

---

[3] The plaintiffs contend that Wolters retains control over all aspects of the Plan, but the Summary Plan Description states that Wolters "has delegated its authority to finally determine claims to the health plans for benefit claims."  SPD at 128.

(7th Cir. 2009). "ERISA also requires that 'specific reasons for the denial of coverage were communicated to the claimant and whether the claimant was afforded an opportunity for full and fair review by the administrator.'" *Holmstrom*, 615 F.3d at 766 (internal citation omitted).

### 1. October 2018 Paradigm

The plaintiffs argue that Blue Cross's denial of coverage for Campbell's treatment at Paradigm from October 30, 2018 to November 6, 2018 was arbitrary and capricious. They point out that about two weeks earlier Blue Cross had deemed residential treatment medically necessary. They also contend that the opinions of Dr. Helding and Dr. Chavason, which Blue Cross repeated verbatim in the denial notices, were based on an unreasonably limited and selective view of the medical evidence.

As this Court has recognized, "the fact that Blue Cross had previously determined that residential treatment was medically necessary does not create a presumption in the plaintiff's favor, and 'a reversal based on new information is not a nonuniform interpretation' of the plan." *Dominic W. on behalf of Sofia W. v. N. Tr. Co. Emp. Welfare Benefit Plan*, 392 F. Supp. 3d 907, 916 (N.D. Ill. 2019) (Kennelly, J.) (citing *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606-07 (7th Cir. 2007)); *see also Holmstrom*, 615 F.3d at 767 ("The plan administrator is entitled to seek and consider new information and, in appropriate cases, to change its mind."). This Court has rejected, however, "read[ing] *Mote* and *Holmstrom* to permit an administrator to reverse course on [a] whim without adequate justification or a reasonable evidentiary basis for the decision." *Dominic W.*, 392 F. Supp. 3d at 916. "Rather, 'a plan's determination must still have a reasoned basis to survive judicial review, even under the deferential

standard of review[,]' and the decision to provide benefits in the first instance is 'part of the overall set of facts' that the Court must consider." *Id.* (quoting *Holmstrom*, 615 F.3d at 774, 767).

In the initial notice denying the October 2018 Paradigm claim, Blue Cross justified denying coverage by quoting from Dr. Helding's notes:

> You are not having plan or intent to hurt yourself or anyone else. You are not hearing voices or seeing things that are not there. You are not hearing voices telling you to harm yourself or others. You are not aggressive or violent. There are no medical problems reported. No severe side effects from medications. You could be treated at a lower level of care.

AR, HCSC_HATCH_0004956, 0008593. Yet when Blue Cross reviewer Varughese determined that Campbell met the criteria for residential treatment on October 4 and again on October 9, Campbell also had "no plan or intent" to commit suicide or homicide, "no psychosis, no aggression," "no medical issues," and there was no mention of her hearing any voices. *Id.*, HCSC_HATCH_0008608, 0008611. Neither the claim denial notice nor Dr. Helding's notes explain why the same facts that warranted Campbell's admission into residential treatment a few weeks earlier were suddenly insufficient for eight more days of continued care. At best, Dr. Helding stated without explanation that "[a]s of 10/30/2018 [Campbell] is improving," but he also noted in that same paragraph that Campbell experiences "[s]ignificant emotional dysregulation *with urges to harm herself and suicidal thoughts* when she is overwhelmed" and "[t]alks about being adopted and how overwhelming that is." *Id.*, HCSC_HATCH_0008608 (emphasis added). This finding undercuts rather than supports his statement that Campbell was "not having plan or intent to hurt [her]self," and given the lack of any other justification, there is no basis to say that Dr. Helding's and Blue Cross's denial of

treatment had "a reasoned basis to survive judicial review, even under the deferential standard of review." *Holmstrom*, 615 F.3d at 774.[4]

Blue Cross's denial of Paradigm's expedited appeal is similarly arbitrary and capricious. The notice denying the appeal stated that Campbell did not meet the criteria for continued residential treatment because:

> You are not a danger to yourself. You are not a danger to others. You do not have psychiatric conditions that need this level of care. You do not have medical conditions that need this level of care. You do not have substance use issues that need this level of care. You are taking medications. You are completing your actves of daily living. You are motivated. You are participating in your treatment. You can safely be treated in a lower level of care. You have supportive family. You have a safe discharge plan

AR, HCSC_HATCH_004930. This language is identical to the language in Dr. Chavason's notes denying the appeal, strikingly similar to Dr. Helding's findings, and did not address new evidence or facts mentioned in Dr. Chavason's own notes. *See id.*, HCSC_HATCH_008590. In particular, Campbell's treating psychiatrist Dr. Neumann conducted a psychiatric evaluation on November 3, after Dr. Helding denied the claim and before Dr. Chavason reviewed the case. In that evaluation, she noted that Campbell had "endorsed [suicidal ideation] and feeling overwhelmed" that day and was "at elevated risk for harm to herself" for a variety of reasons. *Id.*, HCSC_HATCH_0001681. As a result, Dr. Neumann concluded that Campbell "can be appropriately managed" through residential treatment. *Id.* When Dr. Chavason spoke

---

[4] Although Wolters argues in its response brief that the denial was not arbitrary or capricious because Campbell had shown improvements in her activities of daily living, sleep, and grief and parental issues, the claim denial notice did not allude to any of these reasons, and Blue Cross was "required to give [the plaintiff] every reason for its denial of benefits at the time of the denial." *Reich*, 306 F.3d at 524 n.1.

with Dr. Neumann on November 6, his notes stated that she "confirm[ed] that [Campbell] is doing better, no [suicidal/homicidal ideation], still struggling with self worth/self esteem, but is working with adopted mom and family better as well. [Campbell] is eating all of her meals and attending to [activities of daily living]." *Id.*, HCSC_HATCH_8590. Dr. Chavason also indicated in his notes that despite this progress, Dr. Neumann nevertheless "want[ed] more time" and was requesting that Blue Cross cover Campbell's residential treatment from October 30 to November 6. *Id.*

Dr. Chavason did not dispute Dr. Neumann's assessment of Campbell's condition. He disagreed, however, with her request for more time, and he denied coverage of Campbell's treatment from October 30 to November 6 as not medically necessary. Though he did not expressly state so in his notes, Dr. Chavason appears to have believed Campbell's treatment was not medically necessary because of the improvements that Dr. Neumann described to him during their November 6 conversation. Yet not only did Dr. Neumann still "want[] more time" for treatment despite those improvements, *id.*, but her statements that Campbell was in a better mental state *as of November 6* do not justify the conclusion that Campbell's treatment *between October 30 and November 6* was not medically necessary. Rather, Dr. Neumann's evaluation of Campbell on November 3—right in the middle of the relevant period—further supports her conclusion that Campbell needed residential treatment, as Campbell had, that very day, expressed suicidal ideation and was "at elevated risk of harm to herself." *Id.*, HCSC_HATCH_0001681. By ignoring this medical evidence and rejecting Dr. Neuman's recommendation in favor of a few statements about Campbell's improvement, Dr. Chavason engaged in a "selective reading[]" of the evidence before

31

him that the Court cannot say was "reasonably consistent with the entire picture" of Campbell's health from October 30 to November 6. *Holmstrom*, 615 F.3d at 766. As was the case in *Leger*, Dr. Chavason "failed to consider [Campbell]'s complete medical history and rejected, without explanation, important aspects of [a medical professional's evaluation]." 557 F.3d 835. This disregard of the relevant evidence, combined with the fact that his stated rationale was a near-verbatim repetition of Dr. Helding's findings, makes it clear that Dr. Chavason's review was cursory, unthorough, and potentially outcome-driven.

In light of all of the factors described above, the Court finds that Blue Cross's refusal to cover Campbell's treatment from October 30 to November 6, 2018 was arbitrary and capricious.

## 2. January 2019 Paradigm

Next, the plaintiffs assert that Blue Cross's denial of coverage for Campbell's January 2019 stay at Paradigm was also arbitrary and capricious. Blue Cross had approved residential treatment at Paradigm three times in December 2018 and January 2019 before denying further treatment on January 10, 2019 and denying the expedited appeal a few days later. The plaintiffs argue that like the denial of Campbell's first stay at Paradigm, this denial was also based on an unreasonably limited and selective view of the medical evidence. The Court agrees.

On January 10, 2019, Blue Cross first issued the plaintiffs a notice denying coverage for treatment after January 9. The notice stated that Campbell did not meet the criteria for residential treatment because:

> You are not having thoughts to hurt yourself or anyone else. You are not hearing or seeing things that are not there. You are not hearing things

> telling you to hurt yourself or others. You are not aggressive or violent.
> There are no medical problems reported. No side effects from your
> medicine. You could be treated at a lower level of care.

AR, HCSC_HATCH_0004842.  This explanation was largely the same as a section of

Blue Cross reviewer Dr. Alkhatib's notes, which itself was identical to language in the

initial notice denying the October 2018 Paradigm claim.  See *id.*,

HCSC_HATCH_0008632, 0004956.  Dr. Alkhatib also noted that he spoke with Dr.

Neumann and that she had "report[ed] that [Campbell] needs [residential treatment

center level of care]," "has urges to use substances," and "*is self harming* (no dates or

details provided)."  *Id.*, HCSC_HATCH_0008632 (emphasis added).  By concluding that

Campbell was not having thoughts of self-harm even though Dr. Neumann had

expressly told him Campbell was harming herself, Dr. Alkhatib appears to have

"refuse[d] to credit a claimant's reliable evidence, including opinions of a treating

physician."  *Holmstrom*, 615 F.3d at 774–75.  The fact that Dr. Alkhatib provided no

explanation for that conclusion suggests that his decision was arbitrary, which is further

supported by the fact that he simply repeated verbatim the findings of Dr. Helding from

two months earlier.

Dr. Alkhatib's conclusion also appears arbitrary when the Court compares

Campbell's condition at the time of his denial to her condition when Blue Cross

approved treatment.  On December 28, 2018, Varughese determined that Campbell met

the criteria for residential treatment even though she supposedly "denied [suicidal

ideation], [homicidal ideation], or psychosis, no aggression" and had "no medical

issues," but had "urges/actions of self-harm[.]"  *Id.*, HCSC_HATCH_0008640.  Less

than two weeks later, Dr. Alkhatib also found that Campbell had "no acute suicidal

33

ideation (with plan, intent, and means), acute homicidal ideation (with plan, intent, and means)," no medication issues, and no "recent threatening or physically aggressive behavior," but he came to the opposite conclusion regarding Campbell's eligibility for residential treatment.  The main distinction seems to be that Dr. Alkhatib believed "[Campbell] does not appear to be an imminent danger to self or others," but as discussed previously, that conclusion inexplicably ignores information from Dr. Neumann to the effect that Campbell *was* self-harming.  For these reasons, the Court finds that Dr. Alkhatib's denial amounts to a sudden reversal lacking "adequate justification or a reasonable evidentiary basis," *Dominic W.*, 392 F. Supp. 3d at 916, which fails to survive review even under the arbitrary and capricious standard.

The denial of Paradigm's expedited appeal fares no better.  The letter informing the plaintiffs of the denial states:

> You are not having thoughts to harm yourself. You are not having thoughts of harming others. You are thinking more clearly. You are cooperative with treatment. You can care for your daily needs.

AR, HCSC_HATCH_0004814.  This language comes from Dr. Ahmad's notes, as he was the Blue Cross reviewer who decided the appeal.  Dr. Ahmad also mentioned in his notes that he was unable to reach Dr. Neumann and therefore based his decision on a review of the "written clinical information[.]"  *Id.*, HCSC_HATCH_0008629.

As this Court has previously held, "[a]lthough an administrator is not prohibited from crediting the opinion of a physician who conducted only a file review, relying on a file review that is contrary to treating doctors' opinions that have substantial medical support may be arbitrary and capricious."  *Dominic W.*, 392 F. Supp. 3d at 917 (citing *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006), *Hennen v. Metro*.

*Life Ins. Co.*, 904 F.3d 532, 540 (7th Cir. 2018)).  "This is particularly true in cases involving psychiatric diagnoses and assessments of risk." *Dominic W.*, 392 F. Supp. 3d at 917 (citing *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBS Emps.*, 741 F.3d 686, 702 (6th Cir. 2014) ("[F]ile reviews are questionable as a basis for identifying whether an individual is disabled by mental illness."); *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016) ("Evaluation of mental health necessarily involves subjective symptoms, which are most accurately ascertained through interviewing the patient and spending time with the patient, such that a purely record review will often be inadequate. . . .") (internal quotation marks omitted)).

The cursory nature of Dr. Ahmad's denial of the expedited appeal underscores these concerns.  Other than the previously mentioned language, which is almost identical to Dr. Alkhatib's stated rationale for initially denying the claim, Dr. Ahmad adds only that "[n]o evidence of immediate safety risk established, either due to life-threatening withdrawal problems or medical or psychiatric comorbidity requiring 24 hour care.  No [homicidal ideation]/[suicidal ideation]/[auditory verbal hallucinations]."  AR, HCSC_HATCH_0008629.  A lack of homicidal or suicidal ideation or hallucinations was not an issue when Blue Cross approved Campbell for residential treatment in October 2018 and again in January 2019, and the statement that there was no safety risk again ignores treating psychiatrist Dr. Neumann's statements that Campbell was self-harming.  Although the plaintiffs bear the burden of establishing that a decision is arbitrary and capricious, a plan administrator must "provide[] a rational explanation that has support in the record[]" when it is "choos[ing] among different medical opinions" in deciding a claim.  *Hennen*, 904 F.3d 540.  In this case, Dr. Ahmad did not provide *any*

explanation—let alone a "rational explanation that has support in the record"—for crediting Dr. Alkhatib's assessment of Campbell's risk of self-harm instead of Dr. Neumann's, and Blue Cross similarly provides no explanation for adopting Dr. Ahmad's opinion. *Id.* Consequently, this is not a case in which a file review involving a psychiatric diagnosis was sufficient even under the deferential arbitrary and capricious standard.

For the above reasons, Blue Cross's denial of benefits for Campbell's treatment at Paradigm from January 10 to January 19, 2019 was arbitrary and capricious.

### 3. CALO

Lastly, the plaintiffs contend that Blue Cross's denial of benefits for Campbell's treatment at CALO was arbitrary and capricious. Blue Cross concluded that Campbell's treatment from April 30 to May 31, 2021 was not medically necessary, and to the extent that it denied Campbell's claim for coverage after May 31 because of insufficient evidence, there is no evidence that it informed the plaintiffs of that decision. See Part B, *supra*. The Court agrees with the plaintiffs that these decisions were based on an unreasonably limited and selective view of the medical evidence.

Blue Cross first denied Campbell's claim in a February 7, 2020 notice, stating that she did not meet the criteria for residential care during May 2019 because:

> At the time of admission and on the dates in question you did not need 24-hour nursing, medical, or psychiatric care. You could have effectively been treated in a less restrictive setting. You did not have suicidal intent. You did not have homicidal ideations. You were completing your daily living needs. You were attending groups. You were going on off-campus passes. You had safe social support. You did not have issues that would prevent you from getting treatment in a lower level of care. You had access to a lower level of care in your home area.

AR, HCSC_HATCH_0008924. This explanation is the same as the rationale for

36

denying benefits in Blue Cross reviewer Dr. Willis's notes. Dr. Willis also found that Campbell "displayed intermittent episodes of maladaptive behaviors that were redirectable . . . . did not have medical issues that needed 24-hour monitoring," and "has supportive family who she could live with," among other factors. *Id.*, HCSC_HATCH_0008658. Like Dr. Ahmad, Dr. Willis indicated in her notes that she conducted a "paper review" and did not treat Campbell or speak with any medical professionals who did so at CALO.

There is no presumption against Dr. Willis's opinion as a file-reviewing physician, but her disregard of other evidence in the record suggests arbitrary decision-making. *Henner*, 904 F.3d at 540. Over the course of May 2019, Campbell harmed herself on several occasions, told peers and staff that she was suicidal or thought about dying often, punched walls and knocked over furniture, and required a heightened level of care on multiple occasions. These facts expressly contradict Dr. Willis's statements that Campbell did not have suicidal intent, and to the extent that Dr. Willis addressed them, she seems to have characterized Campbell's self-harm and physical aggression as merely "maladaptive behaviors that were redirectable." AR, HCSC_HATCH_0008924. Yet Blue Cross approved treatment at Paradigm in October 2018 and January 2019 when Campbell expressed no suicidal ideation, had not recently harmed herself, and displayed no aggression. The Court cannot say that denying treatment when Campbell *did* exhibit all of these behaviors—and doing so based on a conclusory statement that those behaviors were "maladaptive" and "redirectable"—"ha[d] a reasoned basis to survive judicial review, even under the deferential standard of review." *Holmstrom*, 615 F.3d at 774.

37

Wolters also argues that CALO was distinguishable from past admissions because (1) Campbell had previously received care at Paradigm and New Vision, and (2) had a "congruent" mood and no "current" self-harm or somatic concerns at admission.  This contention lacks merit.  Campbell's past treatment, mood and somatic concerns were not mentioned as grounds for the decision in Dr. Willis's notes or the denial notice, and as stated previously, Blue Cross was "required to give [the plaintiff] every reason for its denial of benefits at the time of the denial."  *Reich*, 306 F.3d at 524 n.1.  As for the lack of "current" self-harm at admission,[5] Campbell engaged in multiple instances of self-harm over the course of May 2019, and the denial stated that it was based on her behaviors "[a]t the time of admission *and on the dates in question*."  AR, HCSC_HATCH_0008924 (emphasis added).  The Court concludes that the initial denial of treatment at CALO based on Dr. Willis's opinion was arbitrary and capricious.

The same is true for Blue Cross's denial of the plaintiffs' appeal.  Blue Cross's September 2020 notice denying the appeal stated:

> You do not have a plan or intent to harm yourself. You do not have a plan or intent to harm others. You are not hearing voices telling you to harm yourself or anyone else. You are not aggressive or violent. There are no medical issues that require treatment at this level of care. You have no severe side effects from medications. You could be treated safely and effectively at a lower level of care.

*Id.*, HCSC_HATCH_0003596.  This language is the same as the explanation in Blue Cross reviewer Dr. Lavender's notes.  *Id.*, HCSC_HATCH_0008956.  Like Dr. Willis, Dr.

---

[5] This appears to be based on the May 1, 2019 assessment by Campbell's treating therapist Malinda Williams, which stated "currently none reported" under a section for "suicidal, self-injurious, or aggressive behaviors."  AR, HCSC_HATCH_0003419.  Yet Williams noted in that same assessment that Campbell had exhibited "Self-injurious Behavior Without Suicide Intent," and as previously indicated, Campbell harmed herself on several occasions during May 2019.

Lavender noted that his review "was based on a copy of the medical record," and he also stated that Campbell "was admitted due to emotional dysregulation and irritability. There were no report of [suicidal ideation]/[homicidal ideation]'s." *Id.*

In affirming Dr. Willis's denial, Dr. Lavender not only ignores the evidence of Campbell's self-harm, suicidal thoughts, and physical aggression during May 2019 that Dr. Willis disregarded; he also fails to address the letter from treating therapist Malinda Williams that the plaintiffs submitted with their appeal. Dr. Willis's findings that Campbell had no intent to harm herself, commit suicide, or harm others are directly contradicted by Williams, who reported that Campbell had required "physical interventions" because of her "physical aggression, running from the staff/program, property destruction, and self-harm." *Id.*, HCSC_HATCH_000529. Williams also stated that Campbell would "begin kicking and hitting the walls" and "self-harm when dysregulated or feeling shameful as well," and "had been physically aggressive towards peers but usually not tried to hurt them." *Id.* One might have reasonably disagreed with Williams's conclusions that it was "medically necessary for Campbell to remain in treatment and CALO" and "not recommended that [Campbell] be in the home or community environment[,]" *id.*, but here Dr. Willis "[did] not acknowledge, much less analyze, the significant evidence" undercutting his conclusions found in Campbell's May 2019 CALO records and Williams's letter. *Majeski*, 590 F.3d at 483. Given that the Seventh Circuit has "found it arbitrary and capricious for a plan administrator 'simply [to] ignore' a treating physician's medical conclusion and to "dismiss [other] conclusions without explanation'" as Dr. Lavender and Blue Cross have done here, *id.* at 484, the denial of the plaintiffs' CALO appeal cannot survive judicial review.

As for Campbell's claim for treatment after May 31, 2019, the record suggests that Blue Cross denied the claim because of supposedly insufficient evidence without informing the plaintiffs of that decision.  See Part B, *supra*.  This alone would violate ERISA given that CALO responded to Blue Cross's requests with at least eighteen submissions.  *Holmstrom*, 615 F.3d 766 ("ERISA also requires that 'specific reasons for denial *be communicated to the claimant* and that the claimant be afforded an opportunity for full and fair review by the administrator.') (emphasis added) (internal citation omitted).  Even if such a failure were permissible, however, Blue Cross's reasons for finding multiple CALO submissions insufficient were almost identical, and given the circumstances this is indicative of a failure actually to address the evidence that was provided.  *Compare* AR, HCSC_HATCH_8652, 10/22/2020 Request Notes ("Need complete medical record including level of care . . . discharge summary, detained clinic notes from and treatment record for entire treatment episode."), *with id.*, 11/03/2020 Request Notes ("Need complete medical record including level of care, diagnosis, intake assessment, discharge summary, psychological evaluation, detailed clinical notes, and treatment records for entire treatment episode."), and *id.*, 11/10/2020 Request Notes ("Need complete medical record including level of care, diagnosis, intake assessment, discharge summary, psychological evaluation, detailed clinical notes, and treatment records for entire treatment episode.").  The use of boilerplate language and failing to address the evidence submitted is classic arbitrary and capricious behavior, and thus Wolters's denial of coverage from June 1, 2019 to August 17, 2020 also cannot stand.

**E.      Remedies**

Having found that Blue Cross's denial of benefits was arbitrary and capricious, the Court must determine the appropriate remedy.  "When an ERISA plan administrator's benefits decision has been arbitrary, the most common remedy is a remand for a fresh administrative decision rather than an outright award of benefits[.]" *Holmstrom*, 615 F.3d at 778.  However, "[t]he claimant's benefit status prior to the denial informs [a court's] determination," and "[i]n fashioning relief for a plaintiff who has sued to enforce her rights under ERISA . . . [courts] have focused 'on what is required in each case to fully remedy the defective procedures given the status quo prior to the denial or termination' of benefits."  *Id.* (internal citation and quotation marks omitted).  The Seventh Circuit has distinguished between cases "dealing with a plan administrator's initial denial of benefits" and cases "where the plan administrator terminated benefits to which the administrator had previously determined the claimant was entitled."  *Id. Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629 (7th Cir. 2005) (internal citation and quotation marks omitted).

Like the defendant in *Holmstrom*, Blue Cross initially determined that Campbell's stays at Paradigm in both October 2018 and January 2019 qualified for coverage before it "then reversed its position in applying the same standard."  *Holmstrom*, 615 F.3d at 779.  Because the Court has found those reversals to be arbitrary and capricious and "the record indicates that [the plaintiff]'s condition has either remained constant or worsened since" that decision—as evident from her continued self-harm and need for treatment at New Vision and CALO—"[r]etroactive reinstatement of benefits is therefore the appropriate remedy."  *Id.*; *see also Schneider*, 422 F.3d at 629–30 (retroactively

reinstating benefits because the plaintiff "ceased receiving benefits to which she had earlier been determined to be entitled"); *Hackett*, 315 F.3d at 775–76 (reinstating because "the status quo prior to the [termination under the] defective procedure was the continuation of benefits").  The Court therefore vacates Blue Cross's decision terminating coverage and directs it to reinstate benefits for Campbell's treatment at Paradigm from October 30, 2018 to November 6, 2018 and January 10, 2019 to January 18, 2019.

As for New Vision and CALO, the Court vacates Blue Cross's decisions denying coverage in the first instance but remands the matter for a fresh administrative decision. "[G]enerally, when a court or agency fails to make adequate findings or fails to provide an adequate reasoning, the proper remedy in an ERISA case . . . is to remand for further findings or explanations, unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Leger*, 557 F.3d at 834 (internal citation and quotation marks omitted).  In this case, the Court reverses because the Plan arbitrarily and capriciously determined that Campbell's treatment at New Vision was excluded and that her treatment at CALO was not medically necessary.  The record before the Court, however, does not definitively establish that (1) New Vision is covered by the Plan, or (2) Campbell's treatment at CALO was medically necessary for the entire period from April 30, 2019 to August 17, 2020 given her apparent progress at some points and setbacks at others. Consequently, the Court concludes that the proper course of action in this case is to remand the New Vision and CALO claims for further findings.

Lastly, the parties dispute the appropriate amount of monetary recovery and

whether the plaintiffs should recover attorneys' fees and prejudgment interest. The Plan states that "the maximum allowance will be the lesser of: [t]he provider's billed charges, or; [t]he claims administrator's non-contracting maximum allowance." SPD at 182. Wolters contends that the maximum allowance in this case is fifty percent of the standard billed charges because Paradigm, New Vision, and CALO are "non-participating professional providers," but that is only true under the Plan "[w]hen a Medicare reimbursement rate is not available for a covered service or is unable to be determined on the information submitted on the claim." SPD at 183. Otherwise, "the non-contracting maximum allowance is developed from base Medicare reimbursements and represents approximately 100% of the base Medicare reimbursement rate and will exclude any Medicare adjustment(s) which is/are based on information on the claim." SPD at 182. Because the parties' briefs and the record before the Court do not provide sufficient information to determine the facts needed to resolve these disputes—including the question of whether a Medicare reimbursement rate is available or able to be determined for the services in question—further submissions will be required before the Court can make an appropriate award on the claims in which it has ruled in the plaintiffs' favor and before it can rule on prejudgment interest on that award. The matter of attorneys' fees is more appropriately determined by way of supplemental submissions. At the upcoming status hearing, the Court will discuss a schedule for determining these matters.

## Conclusion

For the foregoing reasons, the Court grants the plaintiff's motion for summary judgment and denies the defendants' motion [dkt. nos. 59, 76]. The case is set for a

telephonic status hearing on August 9, 2023 at 9:10 a.m., to set a schedule for further proceedings required to bring the case to a conclusion. The parties are directed to promptly confer on these points and are to file a joint status report with a proposal, or competing proposals if they cannot agree, by August 7, 2023.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 1, 2023